UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTOINETTE MARIE GRIFFITH,

                             Plaintiff

-vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                             Defendant.

DECISION AND ORDER

08-CV-6004 CJS

_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Catherine M. Callery, Esq.<br>Louise M. Tarantino, Esq.<br>Empire Justice Center<br>One West Main Street, Suite 200<br>Rochester, New York 14614-1479 |
| For the Defendant: | John J. Field, Esq.<br>Assistant United States Attorney<br>100 State Street<br>Rochester, New York 14614 |

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied plaintiff Antoinette Marie Griffith's ("Plaintiff") application for disability insurance and supplemental security income benefits. Now before the Court is Defendant's motion for judgment on the pleadings [#7], and Plaintiff's cross-motion for an order reversing Defendant's decision and remanding the matter for calculation of

benefits [#8], or, in the alternative, remanding the case to a new administrative law judge. For the reasons that follow, Defendant's application is denied, Plaintiff's application is granted in part, and this matter is remanded for further administrative proceedings.

PROCEDURAL HISTORY

On June 2, 2004, Plaintiff applied for disability and supplemental security income benefits, claiming to be disabled due to back pain. (90).[1] With regard to disability benefits, Plaintiff remained insured through December 31, 2008. (12). The alleged onset date of Plaintiff's disability was September 1, 2003, when she was involved in a motor vehicle accident. (90). The Commissioner denied Plaintiff's application, and she requested a hearing before an administrative law judge ("ALJ"). On March 21, 2007, a hearing was held before ALJ Bruce Mazzarella. On April 26, 2007, the ALJ issued a decision denying benefits, finding that Plaintiff could perform her past relevant work as a collections agent, since she had the residual functional capacity (RFC) to perform sedentary work. (15-21). On November 16, 2007, the Appeals Council denied Plaintiff's request for review. (5-8). On January 2, 2008, Plaintiff commenced the subject action.

VOCATIONAL HISTORY

Plaintiff was forty-nine years of age at the time of the hearing, and had completed high school and some vocational training in mechanical drafting. (380, 389-90). Her employment history included work as a factory worker making baseball caps and electrical alternators, a deli worker, and a plant nursery employee. (90). Plaintiff

---

[1]Unless otherwise noted, citations are to the Administrative Record.

also worked as a collection agent from September 2000 until June 2001, when she was fired from the position, because she "couldn't perform the job." (48).  It is unclear why Plaintiff could not perform the job, although the reason apparently had nothing to do with her alleged disability.

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here.  It is sufficient for purposes of this Decision and Order to note the following facts.

In November 1997, Plaintiff's primary care doctor, Timothy Siepel, M.D. ("Siepel") reported that Plaintiff had "a history of persistent lower back pain with radiculopathy." (197).  An x-ray of Plaintiff's lumbosacral spine showed disc space narrowing at L4-5 and L3-4.  A CT scan of the spine showed "diffuse disc bulge at L4-5 which flattens the anterior thecal sac.  This is combined with mild bilateral ligamentum flavum hypertrophy which may result in some degree of lateral recess stenosis [narrowing]." (197).

On September 1, 2003, Plaintiff was injured in a motor-vehicle accident, in which her vehicle was rear ended, pushed into the path of an oncoming car, and then struck again on the left passenger side.  As a result, Plaintiff suffered a concussion, with loss of consciousness, along with neck and back pain.  Plaintiff's neck pain eventually resolved, however, her back pain persisted.

On March 24, 2004, Siepel referred Plaintiff to Naren Kansal, M.D. ("Kansal"), a neurologist.  Plaintiff told Kansal, with regard to her back pain, that "sitting is the worst position,"and that although she initially had pain radiating into her left leg, with

3

numbness in her left big toe, the leg pain had subsided, but the numbness remained. (273). Kansal examined Plaintiff and stated that Plaintiff's lumbar spine was normal, with no paraspinal spasm, although there was pain at the lumbosacral junction area and some tenderness. (274). Kansal's impression was "left lumbar radiculopathy[2], etiology undetermined." (274).

On August 6, 2004, Plaintiff was examined by Mohammad Jaffri, M.D. ("Jaffri"), a non-treating consultative examiner. At that time, Plaintiff was complaining of "constant" low back pain, with numbness in her left big toe. (290). Plaintiff stated that "sitting or standing for 10 minutes aggravate[d] the pain," and that she became tired after walking for more than five minutes. (290). Jaffri summarized Plaintiff's MRI scans as showing "disk degeneration at L3-4 with marked collapse," "broad annular bulge at L3-4 with mild central canal stenosis," "annular bulge at L4-5," and "eccentric nerving of the left neural foramen." (290). Plaintiff indicated to Jaffri that she cooked meals, and performed shopping once a week, but did no cleaning or laundry, due to pain. On physical exam, Jaffri observed that Plaintiff had difficulty walking heel to toe and difficulty squatting, and that Plaintiff had "mild spinal tenderness and muscle spasm in the low back," but "no SI joint or sciatic notch tenderness." (292). Jaffri's diagnosis, in relevant part, was "history of motor vehicle accident with resultant lower back pain. MRI of the lumbar spine showing disk degeneration L3-4 with marked collapse and also mild central canal stenosis [narrowing] L3-4, and annular bulge at L4-5 narrowing left neural foramen [tunnel]." (292). Jaffri concluded that Plaintiff would have the following

---

[2]Radiculopathy is defined as "any pathological condition of the nerve roots." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY (1993) at 599.

4

limitations: "Moderate limitations with lifting and carrying heavy weights around. Moderate limitation with prolonged standing and walking. Mild limitation with prolonged sitting. Mild limitation with pushing or pulling." (292). Jaffri did not quantify, in hours, the terms "moderate" and "mild."

On August 19, 2004, Kansal examined Plaintiff, and reported that, "[c]linically, she is just not any better." (311). Kansal stated that recent EMG and nerve conduction studies were "completely normal." (311). Such negative test result did not, however, cause Kansal to doubt that Plaintiff was experiencing low back pain, or cause him to rule out spinal stenosis as the cause. (309). At that time, Kansal concluded that Plaintiff's "best option will be to consider epidural steroids." (311).

On March 9, 2005, Kansal examined Plaintiff and stated that Plaintiff was still complaining of back pain, though her legs were "feeling fine." (309). On physical examination, Kansal observed "tenderness of both the lumbosacral junction area as well as some of the sacroiliac joint." (309). Kansal stated that it was "conceivable" that Plaintiff's spinal stenosis at L3-L4 was causing the pain. Kansal indicated that Plaintiff could pursue chiropractic treatment, or possibly surgery, consisting of "decompressive lumbar laminectomy." (309).

On July 14, 2005, Siepel examined Plaintiff, who was complaining of low back pain, with occasional pain into the left leg. (346). Siepel's assessment was herniated disc (L3-L4), lumbar canal stenosis, and sciatica, left L4. (346). Siepel referred Plaintiff for physical therapy, and noted that a previous epidural steroid injection had been "uncomfortable, and not very effective." (346).

On July 17, 2006, at Siepel's request, Plaintiff had an MRI test, which showed,

5

*inter alia*, "severe degenerative disk disease and annular bulging leading to [moderate to severe] spinal canal stenosis at L3-4," and "small left paracentral disk herniation at L4-5 with compromise of the left L4 neural foramen." (198).

On August 2, 2006, Siepel examined Plaintiff and observed that her "thoracolumbar spine motion was abnormal." (178). His assessment was herniated disc (L3-L4) and lumbar canal stenosis. Plaintiff indicated that she did not want surgery, because of its risks, but Siepel "warned her [that] she may not improve with time." (178).

On September 13, 2006, Siepel completed an RFC assessment form. (173-177). Siepel stated that Plaintiff could lift and carry up to five pounds occasionally, and never more than that. (173). Siepel stated that Plaintiff could sit for fifteen minutes at a time without interruption, and for four hours in an eight-hour workday. Siepel stated that Plaintiff could stand for fifteen minutes at a time without interruption, and for two hours total in an eight-hour workday. Siepel stated that Plaintiff could walk for fifteen minutes at a time without interruption, and for two hours total in an eight-hour workday. (174). Siepel indicated that he based his opinions regarding sitting, standing, and walking on Plaintiff's "statement of her experience." (174). Siepel further stated that Plaintiff could never climb, stoop, crouch, kneel, or crawl, and that he based that opinion on Plaintiff's "report of pain, her known herniated disc on MRI [and] her restriction of movement on exam." (175). Siepel also stated that Plaintiff would likely miss more than four days of work per month because of her impairments. (177).

On September 25, 2006, Plaintiff was examined by S. David Miller, M.D. ("Miller"), a non-treating consultative examiner, at the request of her insurer. (203-207).

6

Miller noted that Plaintiff's current complaint was low back pain, without radiation of pain into the lower extremities, but with constant numbness in her left great toe. (204). Plaintiff also complained to Miller that "prolonged sitting and standing aggravate[d] her back pain symptoms." (204). Miller reported that Plaintiff appeared to be in "limited discomfort," though she was able to sit during the office visit "without apparent discomfort." (206). Miller reviewed Plaintiff's medical file, including her MRIs and X-rays. Miller also conducted a physical examination. Miller stated that Plaintiff's diagnoses included "aggravation of preexisting cervical and lumbar degenerative changes, and precipitation of left lower extremity radicular symptoms with a residual left lumbar sensory radiculopathy." (207). Miller concluded, in relevant part: "It is my medical opinion that Ms. Griffith has a permanent partial impairment related to her residual low back pain condition with left lower extremity sensory radiculopathy, moderate in degree." (207). Miller stated that Plaintiff was appropriately prescribed hydrocodone and lidoderm patches "for palliative pain control," and that she would need those medications, as well as a TENS unit and home lumbar traction unit, "on an indefinite basis." (207).

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

---

[3]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

9

other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; accord 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a). The regulation further states, in pertinent part:

10

Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairment: "chronic low back pain with objective medical evidence of degenerative disc disease with bulging[5] disc and stenosis but no nerve entrapment." (14). At step three of the sequential analysis, the ALJ found that Plaintiff did not have a listed impairment. At step four, the ALJ found that Plaintiff could perform her past relevant work as a collections agent. In making that determination, the ALJ found that Plaintiff had the RFC to perform sedentary work. Specifically, the ALJ concluded that Plaintiff had the RFC "to sit two hours at one time and with normal breaks and meal periods eight hours in an eight-hour workday, stand and/or walk on an occasional basis and up to two hours in an eight-hour

---
[5] As discussed above, the L4-5 disk is actually herniated, as opposed to merely bulging. (198).

11

workday, and lift and carry 10 pounds on an occasional basis." (15). The ALJ found that, although Plaintiff had medically determinable impairments that could be expected to produce her symptoms, her statements regarding her symptoms were "not entirely credible." (16). The ALJ noted, for example, that although Plaintiff had tried to return to work after her MVA, she looked "for work well above her [RFC], applying for jobs as a deli worker (requiring light to medium exertion) and veterinary assistant (requiring medium exertion)." (18). The ALJ failed to mention, however, that Plaintiff also applied for secretarial work. (391). The ALJ also questioned the sincerity of Plaintiff's efforts to obtain vocational re-training: "[W]hen asked at the hearing about her experience with [New York State Vocational and Educational Services for Individuals with Disabilities (VESID)], the claimant replied that although she did contact them, they never called her back and she did not recontact them." (18). Actually, however, Plaintiff testified that after she requested vocational rehabilitation and was referred for testing, and after the agency did not contact her, she wrote to them, and she had recently received a telephone message from the agency, stating that they would call her back. (391). Accordingly, the statement that Plaintiff "did not recontact them" is incorrect.

The ALJ decided not to give controlling weight to Siepel's opinions, even though Siepel was Plaintiff's treating physician. (18). In that regard, the ALJ noted that Siepel based his opinion on Plaintiff's subjective complaints of pain, MRI testing showing a "herniated disc," and restrictions of movement observed on physical exam. (18). The ALJ rejected Siepel's opinion, though, since, while the MRI testing revealed disc herniation at L4-5, as well as lumbar disc bulging with stenosis, it did not indicate "nerve root compression." (19). The ALJ concluded, on that reasoning, that Siepel's medical

12

opinion was therefore "based largely" on Plaintiff's subjective complaints, and was "not consistent with the objective evidence of record." (19).

The ALJ gave greater weight to the opinons of Miller and Jaffri, each of whom were non-treating consultative examiners, who each examined Plaintiff on only one occasion. In that regard, the ALJ observed that Miller's and Jaffri's opinions were "consistent with each other and with the objective medical evidence of record showing only degenerative disc disease and bulging discs without nerve room compromise, and absence of radiculopathy as indicated by normal EMG-NCS studies." (19).

The ALJ also questioned Plaintiff's credibility regarding pain symptoms. For example, although Plaintiff claimed to experience pain after sitting for more than ten minutes, the ALJ observed that Plaintiff sat and testified at the hearing for more than thirty minutes. (19). However, at the hearing, Plaintiff stated that she was in pain, even though she was still able to answer questions. (404-405). Nevertheless, the ALJ determined that Plaintiff's pain with prolonged sitting was not sufficiently severe, since it did not interfere with her ability to answer questions. The ALJ also relied on Miller's statement that, during his exam, Plaintiff was "able to sit without apparent difficulty," despite the fact there was no indication how long Plaintiff sat during the exam. (20). The ALJ also found that Plaintiff exaggerated her inability to lift. In making that finding, the ALJ found inconsistent Plaintiff's testimony that she could lift only eight pounds, since her doctor had previously prescribed "no lifting greater than 10 lbs." (20, 123). The ALJ further noted a statement in Plaintiff's medical report that "lifting wood for heating the house still creates pain." (20) The ALJ concluded that such statement "suggest[s] that she was lifting well over five to ten pounds." (20). The ALJ also thought that Plaintiff

13

testified falsely concerning her ability to walk. (20) The ALJ made that finding because, at the hearing, Plaintiff testified that she could walk around a city block at one time, while she had previously reported being able to walk up to two miles per day. (408).

Based on his RFC assessment, and on his finding that Plaintiff could perform her past relevant work as a debt collector, the ALJ denied Plaintiff's claim for benefits.[6]

ANALYSIS

Applying the applicable legal principles discussed above, the Court finds that the ALJ committed errors of law that require the reversal of the Commissioner's decision. First, in deciding not to give controlling weight to Siepel's medical opinions, the ALJ failed to properly apply the treating physician rule. The ALJ found that Siepel's opinion was deficient because it was "based largely on [Plaintiff's] subjective complaints, which were not supported by objective evidence. (18-19). In that regard, the ALJ stated that,

> the only objective medical evidence of a 'known herniated disc on MRI' is a 'small left paracentral disc herniation at L4-5' *without* nerve root compression[7] shown on a July 2006 MRI. (Exhibit 12F). The claimant does have lumbar disc bulging with stenosis, but no nerve root compression. Therefore, as Dr. Siepel 's assessed limitations were based largely on the claimant's subjective complaints that are not consistent with the objective evidence of record, his findings and opinions are not given controlling weight. (Exhibits 5F, 12F).

(18-19) (emphasis in original). In making this determination, the ALJ improperly substituted his own judgment for Siepel's medical opinion. *See, Rosa v. Callahan*, 168

---

[6]The ALJ noted that Plaintiff claimed to be unable to perform that job, and that she had been fired. (21). The ALJ did not attempt to clarify the reasons why Plaintiff had been fired, but instead, observed that she "had provided no evidence that she lacked the physical, educational or mental ability to perform a collection's agent [sic] job." (21).

[7]The Commissioner's "musculoskeletal listing," Listing 1.04, Disability Evaluation Under Social Security (Blue Book- September 2008), refers to nerve root compression, however, Plaintiff does not claim to have a listed impairment.

F.3d 72, 79 (2d Cir. 1999) ("In analyzing a treating physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (citations and internal quotation marks omitted). Specifically, the ALJ apparently concluded that evidence of nerve root compression is necessary for a diagnosis of low back pain. However, there is no medical opinion in the record supporting that view, and the ALJ was not competent to provide his own opinion. *See, Rosa v. Callahan*, 168 F.3d at 79 ("[A]s a 'lay person[ ],' the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by Dr. Ergas in his assessment.").

Nor, despite the ALJ's finding, was it improper for Siepel to rely on Plaintiff's subjective complaints in forming his opinion. This is particularly so where such complaints were supported by objective MRI tests indicating "significant end plate sclerotic change at the L2-3 level, and more significantly at the L3-4 level," "Scmorl's node [disc protrusion] along the superior end plate of L4," "[s]ignificant degenerative disk disease . . . at L3-4," "significant annular bulging and degenerative [sic] at L3-4 causing moderate to severe canal stenosis," and a "small paracentral disk herniation at L4-5 . . . [causing] compromise of the left L4 neural foramen." (198). *See, Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that Dr. Helfand also relied on Green-Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (citation and internal quotation marks omitted).

The ALJ gave greater weight to the opinion of Jaffri, who examined Plaintiff once, than to the opinion of Siepel. The Court finds, however, that Jaffri's opinion does not

15

provide substantial evidence for the ALJ's RFC determination. Significantly, Jaffri's opinion was rendered in 2004, meaning that he did not have the benefit of Plaintiff's 2006 MRI. Based on MRI studies from 2003, Jaffri reported, for example, that Plaintiff had only "mild central canal stenosis" and a "bulge at L4-5," while the 2006 MRI showed "moderate to severe canal stenosis," and a "small paracentral disk herniation at L4-5 . . . [causing] compromise of the left L4 neural foramen." (198).[8]

Additionally, Jaffri described Plaintiff's ability to sit, stand, and walk, only in terms of "moderate" and "mild" impairments. Based on this vague statement from Jaffri, as well as the opinions of "State Agency Officials"[9] (Exhibits 1B,6F), the ALJ concluded that Plaintiff had the RFC "to sit two hours at one time and with normal breaks and meal periods eight hours in an eight-hour workday, stand and/or walk on an occasional basis and up to two hours in an eight-hour workday, and lift and carry 10 pounds on an occasional basis." (15). It is unclear how the ALJ arrived at these specific findings.

The Court also finds that the ALJ's credibility determination was erroneous, since, as discussed above, he appears to have strained to find inconsistencies in Plaintiff's testimony. For example, the fact that Siepel indicated that Plaintiff should not lift "more than ten pounds" is not necessarily inconsistent with her testimony that she could lift

---

[8] The ALJ referred to the 2006 MRI only in passing, and then appears to have downplayed the results. (18-19). In that regard, the ALJ minimized the L4-5 disk herniation, and summarized the MRI findings as showing "lumbar disc bulging with stenosis, but no nerve root compression." (19).

[9] Although the ALJ claimed to rely on the State Agency Officials' reports (Exhibits 1B,6F), which indicated that Plaintiff could perform light work, he rejected those reports, purportedly in order to give Plaintiff "the benefit of the doubt," and found instead that she is capable of sedentary work. (19). In any event, the State Agency Officials' reports, which are conclusory, stale, and based on an incomplete medical record, are not substantial evidence. *See, Green-Younger v. Barnhart*, 335 F.3d at 107 ("[T]he reports of two SSA consulting physicians, who did not examine Green-Younger, are also not substantial evidence.").

only eight pounds. Nor does the fact that Plaintiff experienced pain while carrying an unspecified type and amount of firewood "suggest that she was lifting well over five to ten pounds." (20). Moreover, in finding that Plaintiff had not made a sincere effort to return to work, the ALJ selectively omitted the fact that Plaintiff had applied for secretarial work, and he mis-characterized her testimony concerning her contacts with VESID. (18). Also, the ALJ's questions to Plaintiff at the hearing, concerning her ability to sit, were confusing at best. (19, 404-406).

The ALJ also apparently found that Plaintiff's decision to avoid back surgery, due to her fear of the risks involved, reflected negatively on her credibility. (20). However, while surgery may have been discussed as an option, it is not clear that any of Plaintiff's doctors actually *recommended* surgery. (309); (*see also*, 409: "Q. Has surgery been suggested? A. Yes, but they also said that if they did that, it would be a continuous surgery, one after another because I have the disk disease. ALJ: Who said that? CLMT: That would be Dr. S[i]epel. ALJ: Not Kansal? CLMT: No."). Before drawing a negative inference as to credibility, the ALJ should have clarified the point, by questioning Plaintiff and/or contacting Kansal and Siepel. *See*, SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.").

Finally, it is unclear how the ALJ concluded that Plaintiff could perform her past relevant work as a collections agent, since the record contains no information concerning the exertional and non-exertional requirements of that job, except that it was performed "over the phone." (385).

Accordingly, the Court finds that the matter must be remanded for further administrative proceedings. Remand solely for calculation of benefits would not be appropriate. *See, Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (Holding that remand for calculation of benefits is proper "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.").

The only remaining issue is whether the case should be assigned to a new ALJ. On this point, it is undisputed that the Court may direct that the case be reassigned. *See, e.g., Kolodnay v. Schweiker*, 680 F.2d 878, 881 (2d Cir. 1982) ("Judgment reversed and cause remanded for a hearing by a different administrative law judge."). However, the decision to reassign a case to a new ALJ is generally left to the Commissioner, and courts will not become involved without a good reason. *See, e.g., Henry v. Astrue*, No. 07-CV-2769(JG), 2008 WL 2697317 at *9 (E.D.N.Y. Jul. 3, 2008) ("The selection of a new ALJ on remand, however, has been considered to be within the discretion of the Commissioner of the Social Security Administration.") (collecting cases). The factors to be considered have been stated as follows:

> [R]emand to a new ALJ will be necessary in those situations which compromise [the] integrity [of the disability review process]. Specifically, when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate. Factors for consideration in this determination include: (1) a clear indication that the ALJ will not apply the appropriate legal standard on

remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party.

*Sutherland v, Barnhart*, 322 F.Supp.2d 282, 292 (E.D.N.Y. 2004). Applying these factors in the instant case, the Court finds that reassignment to a new ALJ is not warranted. The Court presumes that upon remand the ALJ will apply the appropriate legal standards, as discussed above.

## CONCLUSION

For the reasons discussed above, defendant's application [#7] is denied, Plaintiff's application [#8] is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order, pursuant to the fourth sentence of 42 U.S.C. § 405(g).

So Ordered.

Dated: Rochester, New York
March 30, 2009

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge